

MANAGEMENT AGREEMENT

THIS AGREEMENT (the "Agreement") is made this _____ day \_\_\_01/01/2021_____ 20\_\_\_\_, by and among _____Bruce J Spagnola Jr_____ (the "Owner"), and Paper Street Realty, LLC DBA Paper Street Properties (the "Agent").

Section 1.  Appointment of Managing Agent.

    1.1  Appointment and Acceptance.  Owner hereby appoints Agent as sole and exclusive Agent of Owner to lease and manage the property described in paragraph 1.2 upon the terms and conditions provided herein. Agent accepts the appointment and agrees to furnish the services of its organization for the leasing and management of the Premises; and Owner agrees to pay all expenses in connection with those services to the extent required herein.

    1.2  Description of Premises.  The properties to be managed by Agent under this Agreement (the "Premises") are:

**PROPERTY ADDRESS**

2635 44th St, Highland, IN 46322

    1.3  Term.  The term of this Agreement shall be for a period of 2 years from the date shown above.

Section 2.  Bank Accounts.  The various bank accounts established under this Agreement, shall at-all-times be established in Agent's name and under Agent's control. Agent's designees shall be the only parties authorized to draw upon such accounts. No amounts deposited in any accounts established under this Agreement shall in any event be commingled with any other funds of Agent.

    2.1  Operating (And/or) Reserve Account(s).  Agent shall establish and maintain a separate account(s) specifically designated as an "agency account" known as the Operating (and/or) Reserve Account(s), separate and apart from Agent's corporate accounts, for the deposit of receipts collected as

described herein, in a bank or other institution whose deposits are insured by the federal government. Such depository shall be Chase Bank or other financial institution reasonably acceptable to Owner. However, Agent shall not be held liable in the event of bankruptcy or failure of a depository. Funds deposited on Owner's account, in the Operating (and/or) Reserve Account(s), remain the property of Owner subject to disbursement of expenses by Agent as described in this Agreement.

    2.2    <u>Security Deposit Account</u>. Agent shall maintain a separate interest-bearing account for tenant security deposits and, where required, advance rentals. Such account shall be maintained in accordance with applicable state or local laws, if any. All security deposits or rent collected more than one (1) month in advance shall be deposited in such account, where required.

Section 3.    <u>Collection of Rents and Other Receipts</u>.

    3.1    <u>Agent's Authority</u>. Agent shall collect (and give receipts for, as required by law or ordinance) all rents, charges and other amounts receivable on Owner's account in connection with the management and operation of the Premises. Such receipts (except tenants' security deposits and, where required, advance rentals, which shall be handled as specified in paragraphs 2.2 and 3.3 hereof; and special charges, which shall be handled as specified in paragraph 3.2 hereof) shall be deposited in the Operating (and/or) Reserve Account(s) maintained by Agent for the Premises.

    3.2    <u>Special Charges</u>. If permitted by applicable law, Agent may collect from tenants any or all of the following: Move In Fee, Late Fee, or a charge for returned or non-negotiable checks, etc. Some of these collections shall be made on account of the Owner and others on account of the Agent, as determined in the "Fee Schedule" of this agreement. Those collected on account of the Agent shall not be considered as "gross receipts" for the purposes of calculating Agent's compensation under Section 17 hereof.

    3.3    <u>Security Deposits</u>. Agent shall collect, deposit, and disburse tenants' security deposits in accordance with the terms of each tenant's lease and as required by law or ordinance. Agent shall pay tenants interest upon such security deposits only if required by law to do so. Agent shall comply with all applicable state or local laws concerning the responsibility for security deposits and interest, if any. Agent shall not accept security deposits unless directed by Owner.

Section 4.    <u>Disbursements from Operating (And/or) Reserve Account(s)</u>.

    4.1    <u>Operating Expenses</u>. From the Operating Account, Agent is hereby authorized to pay or reimburse itself, to the extent permitted hereunder, for all expenses and costs of operating the Premises and for all other sums due Agent under this Agreement, including Agent's compensation, if any, under section 17.

    4.2    <u>Net Proceeds</u>. To the extent that funds are available, Agent shall transmit cash balances to Owner periodically, as follows: once every thirty (30) days. Such periodic cash

balances shall be remitted to the Owner unless otherwise directed.

    4.3    <u>Right to Offset.</u> The Parties agree to provide the right to offset amounts owed to each other only from other affiliated portfolios being managed: (1) for Services rendered and payment advanced; (2) for any undisputed amounts (whether billed or unbilled as of this date of the offset) that, after the expiration of any applicable notice and cure period, are more than forth-eight (48) hours past due under the then-current payment terms; and (3) to the extent that such undisputed past due amounts are recovered, after which the payment terms shall revert to the terms in effect just prior to the offset.

Section 5.    <u>Agent Not Required to Advance Funds</u>. In the event that the balance in the Operating (and/or) Reserve Account(s) is at any time insufficient to pay disbursements due and payable under paragraphs 4.1 and 4.2 above, or other fees, Owner shall, immediately upon notice, remit to Agent sufficient funds to cover the deficiency and replenish the contingency reserve. In no event shall Agent be required to use its own funds to pay such disbursements. Nor shall Agent be required to advance any monies to Owner, to the Security Deposit Account, or to the Operating (and/or) Reserve Account(s). If Agent elects to advance any money in connection with the Premises to pay any expenses for Owner, such advance shall be considered a loan subject to repayment with interest, and Owner hereby agrees to reimburse Agent, including interest as provided in paragraph 17, and hereby authorizes Agent to deduct such amounts from any monies due Owner.

    5.1    <u>Reserves Requirement.</u> As Agent is not required to advance funds Owner is required to supply Agent with monthly reserves. The monthly reserves required for this portfolio equal $200 per rental unit. These reserves will be used to pay for the services and contracts provided by Agent and must be replenished by Owner each month according to the balances provided in Financial Reports.

Section 6.    <u>Financial and Other Reports</u>. By the twentieth (20th) day of each month, Agent shall furnish Owner with a statement of cash receipts and disbursements from the operation of the Premises during the previous month. In addition, Agent shall, on a mutually acceptable schedule, prepare and submit to Owner such other reports as are agreed on by both parties.

    6.1    <u>Owner's Right to Audit</u>. Owner shall have the right to request periodic audits of all applicable accounts managed by Agent, and the cost of such audit(s) shall be paid by Owner, except in the event such audit reveals that Agent did not accurately account for any funds handled by Agent on behalf of Owner, then Agent shall pay the cost of the audit and reimburse Owner any amounts revealed by the audit which should have been paid to Owner.

Section 7.    <u>Advertising</u>. Agent is authorized to advertise the Premises or portions thereof for rent, using periodicals, signs, plans, brochures, or displays, or such other means as Agent may deem proper and advisable. Agent is authorized to place signs on the Premises advertising the Premises for rent, provided such signs comply with applicable laws.

Section 8.    <u>Leasing and Renting</u>.

      8.1    <u>Agent's Authority to Lease Premises</u>. Agent shall use all reasonable efforts to keep the Premises rented by procuring tenants for the Premises. Agent is authorized to negotiate, prepare, and execute all leases, including all renewals and extensions of leases (and expansions of space in the Premises, if applicable) and to cancel and modify existing leases to accommodate new tenants with executed leases. Agent shall execute all leases as agent for the Owner. All costs of leasing shall be paid out of the Operating Account(s).

      8.2    <u>No Other Rental Agent</u>. During the term of this Agreement, Owner shall not authorize any other person, firm, or corporation to negotiate or act as leasing or rental agent with respect to any leases for space in the Premises. Owner agrees to promptly forward all inquiries about leasing the Premises to Agent.

      8.3    <u>Rental Rates</u>. Agent is authorized to establish and change or revise all rents, fees, or deposits, and any other charges chargeable with respect to leases for the Premises.

      8.4    <u>Enforcement of Leases</u>. Agent is authorized to institute, in Owner's name, all legal actions or proceedings for the enforcement of any lease term, for the collection of rent or other income from the Premises, or for the evicting or dispossessing of tenants or other persons from the Premises. Agent is authorized to sign and serve such notices as Agent deems necessary for lease enforcement, including the collection of rent or other income. Agent is authorized, when expedient, to settle, compromise, and release such legal actions or suits or reinstate such tenancies. Attorneys' fees, filing fees, court costs, and other necessary expenses incurred in connection with any Owner approved actions and not recovered from tenants shall be paid out of the Operating Account(s) or reimbursed directly to Agent by Owner. Agent may select the attorney of its choice to handle such litigation.

Section 9.    <u>Employees</u>. Agent is authorized to hire, supervise, discharge, and pay all servants, employees, contractors, or other personnel necessary to be employed in the management, maintenance, and operation of the Premises. All employees shall be deemed employees of the Agent, and Agent shall be liable to Owner or others and indemnify and hold the same harmless from any loss, cost damage or liability, including attorney's fees and costs, for any act or omission on the part of such Agent or employees.

Section 10.    <u>Maintenance and Repair</u>. Agent is authorized to make or cause to be made, through in-house or 3rd Party contracted services or otherwise, all ordinary repairs and replacements reasonably necessary to preserve the Premises in good operating and habitable condition and for the operating efficiency of the Premises, and all alterations required to comply with lease requirements, governmental regulations, or insurance requirements, including, without limitation, Section 8 housing requirements. 3rd Party contracted services are subject to a 20% upcharge by Paper Street Realty, LLC. Agent is also authorized to decorate the Premises and to purchase or rent, on Owner's behalf, all equipment, tools, appliances, materials, supplies, uniforms, and other items necessary for the management, maintenance, or operation of the Premises. Such maintenance and decorating expenses shall be paid out of the Operating Account(s). This section applies except where decorating and/or maintenance are at tenants' expense as stipulated in a lease.

      10.1    <u>Approval for Exceptional Maintenance Expense</u>. The total labor expense to be incurred for any single item of maintenance, alteration, refurbishing, or repair shall not exceed the sum of <u>$1,500</u>, unless such expenses are specifically authorized by Owner, or are incurred under such circumstances as Agent shall reasonably deem to be an emergency. In an emergency where repairs are immediately necessary for the preservation and safety of the Premises, or to avoid the suspension of any essential service to the Premises, or to avoid danger to life or property, or to comply with federal, state, or local law, such emergency repairs shall be made by Agent at Owner's expense without prior approval. Unit turns and Subsidy Inspection work orders are not subject to these approval limits.

Section 11.    <u>Contracts, Utilities and Services</u>. Agent is authorized to negotiate contracts for nonrecurring items of expense, not to exceed <u>$1,500</u> per property unless approved by Owner, and to enter into agreements for all necessary repairs, maintenance, minor alterations, and utility services. Agent shall, at Owner's expense, make contracts on Owner's behalf for electricity, gas, telephone, fuel, or water, and such other services as Agent shall deem necessary or prudent for the operation of the Premises. All utility deposits are paid out of the Operating Account. These contracts and non-recurring items of expense may be subject to a 20% upcharge.

Section 12.    <u>Relationship of Agent to Owner</u>. The relationship of the parties to this Agreement shall be that of Principal and Agent, and all duties to be performed by Agent under this Agreement shall be for and on behalf of Owner, and for Owner's account. In taking any action under this Agreement, Agent shall be acting only as Agent for Owner, and nothing in this Agreement shall be construed as creating a partnership, joint venture, or any other relationship between the parties to this Agreement except that of principal and agent, or as requiring Agent to bear any portion of losses arising out of or connected with the ownership or operation of the Premises. Nor shall Agent at any time during the period of this Agreement be considered a direct employee of Owner. Neither party shall have the power to bind or obligate the other except as expressly set forth in this Agreement.

Section 13.    <u>Save Harmless</u>. Owner shall indemnify, defend, and save Agent harmless from all loss, damage, cost, expense (including reasonable attorneys' fees), liability, or claims for personal injury or property damage incurred or occurring in, on, or about the Premises, which does not arise out of, or relate to, Agent or its agents, employees or contractor's gross negligent or willful acts or omissions. Agent shall indemnify, defend, and save Owner and its agents, members, managers and employees harmless from any and all loss, damage, cost, expense (including reasonable attorneys' fees), liability, or claims for personal injury or property damage incurred by the foregoing, arising out of, or relating to Agent's failure to comply with its obligations hereunder or Agent's gross negligent or willful acts or omissions.

Section 14.    <u>Liability Insurance</u>. Owner shall obtain and keep in force adequate insurance against physical damage (e.g., fire with extended coverage endorsement, boiler and machinery, etc.) and against liability for loss, damage, or injury to property or persons which might arise out of the occupancy, management, operation, or maintenance of the Premises, except for the gross negligent or willful acts or omissions of Agent, and its agents, employee and contractors. The amounts and types of insurance shall be acceptable to both Owner and Agent, and any deductible required under such insurance policies shall be Owner's expense. Agent shall be covered as an additional insured on all

liability insurance maintained with respect to the Premises. Liability insurance shall be adequate to protect the interests of both Owner and Agent and in form, substance, and amounts reasonably satisfactory to Agent. Owner agrees to furnish Agent with certificates evidencing such insurance or with duplicate copies of such policies within five (5) days of the execution of this Agreement. If Owner fails to do so, Agent may, but shall not be obligated to, place said insurance and charge the cost thereof to the Operating Account(s). Said policies shall provide that notice of default or cancellation shall be sent to Agent as well as Owner and shall require a minimum of thirty (30) days written notice to Agent before any cancellation of or changes to said policies. Agent shall carry a commercial general liability insurance policy with limits acceptable to Owner.

Section 15. <u>Agent Assumes No Liability</u>. Agent assumes no liability whatsoever for any acts or omissions of Owner, or any previous owners of the Premises, or any previous management or other agent of either. Agent assumes no liability for any failure of or default by any tenant in the payment of any rent or other charges due Owner or in the performance of any obligations owed by any tenant to Owner pursuant to any lease or otherwise. Nor does Agent assume any liability for previously unknown violations of environmental or other regulations which may become known during the period this Agreement is in effect. Any such regulatory violations or hazards discovered by Agent shall be brought to the attention of Owner in writing, and Owner shall promptly cure them.

Section 16. <u>Owner Responsible for All Expenses of Litigation.</u> Owner shall pay all expenses incurred by Agent, including, but not limited to, reasonable attorneys' fees and Agent's costs and time, and any liability, fines, penalties or the like, in connection with any claim, proceeding, or suit involving an alleged violation by Agent or Owner, or both, of any law pertaining to fair employment, fair credit reporting, environmental protection, rent control, taxes, or fair housing, including, but not limited to, any law prohibiting or making illegal discrimination on the basis of race, sex, creed, color, religion, national origin, or mental or physical handicap, provided, however, that Owner shall not be responsible to Agent for any such expenses in the event Agent is finally adjudged to have personally, and not in a representative capacity, violated any such law, or deemed liable for grossly negligent or willful acts or omissions. Nothing contained in this Agreement shall obligate Agent to employ legal counsel to represent Owner in any such proceeding or suit.

Section 17. <u>Agent's Compensation and Expenses</u>. As compensation for the services provided by Agent under this Agreement (and exclusive of reimbursement of expenses to which Agent is entitled hereunder), Owner shall pay Agent as follows:

    17.1    <u>For Management Services</u>. A management fee equal to $60/unit per month shall apply.

    17.2    <u>For Apartment Leasing</u>. Paper Street charges the Owner a commission equal to one month's rent for leasing any dwelling unit located on the Premises. One month's rent is equal to the amount stated on the lease as the monthly rent amount. This is charged in addition to any fees associated with marketing the listing. Marketing fees shall not exceed $100 for any single listing and are not charged until the unit is leased. Alterations to this fee structure can be made on a per unit basis so long as it is agreed upon in writing by the Owner and Paper Street. The Owner may, from time to time offer special leasing incentives or cap a leasing commission on specific properties. Lease preparation, RTA Packet completion and tenant screening are services included under your basic management fee.

>Owner is charged a flat fee of $150 for each **Lease Renewal**.

Section 18.  Representations.  Owner represents and warrants that Owner has full power and authority to enter this Agreement.

Section 19.  Structural Changes.  Owner expressly withholds from Agent any power or authority to make any structural changes in any building, or to make any other major alterations or additions in or to any such building or to any equipment in any such building, or to incur any expense chargeable to Owner other than expenses related to exercising the express powers vested in Agent through this Agreement, without the prior written consent of the Owner.  However, such emergency repairs as may be required because of danger to life or property, or which are immediately necessary for the preservation and safety of the Premises or the safety of the tenants and occupants thereof, or required to avoid the suspension of any necessary service to the Premises, or to comply with any applicable federal, state, or local laws, regulations, or ordinances, shall be authorized pursuant to paragraph 10.1 of this Agreement, and Agent shall notify Owner appropriately.

Section 20.  Building Compliance.  Agent does not assume and is given no responsibility for (but shall take all reasonable steps to obtain) compliance of the Premises or any building thereon or any equipment therein with the requirements of any building codes or with any statute, ordinance, law, or regulation of any governmental body or of any public authority or official thereof having jurisdiction, except to notify Owner promptly or forward to Owner promptly any complaints, warnings, notices, or summonses received by Agent relating to such matters. Owner represents that to the best of Owner's knowledge the Premises and all such equipment comply with all such requirements, and Owner authorizes Agent to disclose the ownership of the Premises to any such officials and agrees to indemnify and hold Agent, its representatives, servants, and employees, harmless of and from all loss, cost, expense, and liability whatsoever which may be imposed by reason of any present or future violation or alleged violation of such laws, ordinances, statutes, or regulations.

Section 21.  Termination.

>21.1  Termination by Owner.  This Agreement may be terminated at expiration by either party hereto, with or without cause.  Written notice of termination must be received at least sixty (60) days prior to the expiration of this agreement.  The term of this agreement shall be considered month to month upon expiration unless notice to terminate has been given or agreement has been renewed or extended in writing.

>21.2  Owner Responsible for Payments.  Upon termination of or withdrawal from this Agreement, Owner shall assume the obligations of any contract or outstanding bill executed by Agent under this Agreement for and on behalf of Owner and responsibility for payment of all unpaid bills. In addition, Owner shall furnish Agent security, in an amount satisfactory to Agent, against any obligations or liabilities which Agent may have properly incurred on Owner's behalf under this Agreement.  Agent shall deliver to Owner, within five (5) days after the end of the month in which this Agreement is terminated, any balance of monies due Owner or of tenant security deposits, or both, together with the balance in the Operating and Reserve Accounts, which were held by Agent with respect to the Premises, as well as a final accounting reflecting the balance

of income and expenses with respect to the Premises as of the date of termination or withdrawal, and all records, contracts, leases, receipts for deposits, and other papers or documents which pertain to the Premises.

Section 22.  **Indemnification Survives Termination.**  All representations and warranties of the parties contained herein shall survive the termination of this Agreement. All provisions of this Agreement that require Owner to have insured or to defend, reimburse, or indemnify Agent shall survive any termination; and if Agent is or becomes involved in any proceeding or litigation by reason of having been Owner's Agent, such provisions shall apply as if this Agreement were still in effect.

Section 23.  **Headings.**  All headings and subheadings employed within this Agreement and in the accompanying List of Provisions are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

Section 24.  **Force Majeure.**  Any delays in the performance of any obligation of Agent under this Agreement shall be excused to the extent that such delays are caused by wars, national emergencies, natural disasters, strikes, labor disputes, utility failures, governmental regulations, riots, adverse weather, and other similar causes not within the control of Agent, and any time periods required for performance shall be extended accordingly.

Section 25.  **Complete Agreement.**  This Agreement, including any specified attachments, constitutes the entire agreement between Owner and Agent with respect to the management and operation of the Premises and supersedes and replaces any and all previous management agreements entered into or/and negotiated between Owner and Agent relating to the Premises covered by this Agreement. No change to this Agreement shall be valid unless made by supplemental written agreement executed and approved by Owner and Agent. Except as otherwise provided herein, any and all amendments, additions, or deletions to this Agreement shall be null and void unless approved by Owner and Agent in writing. Each party to this Agreement hereby acknowledges and agrees that the other party has made no warranties, representations, covenants, or agreements, express or implied, to such party, other than those expressly set forth herein, and that each party, in entering into and executing this Agreement, has relied upon no warranties, representations, covenants, or agreements, express or implied, to such party, other than those expressly set forth herein.

Section 26.  **Rights Cumulative; No Waiver.**  No right or remedy herein conferred upon or reserved to either of the parties to this Agreement is intended to be exclusive of any other right or remedy, and each and every right and remedy shall be cumulative and in addition to any other right or remedy given under this Agreement or now or hereafter legally existing upon the occurrence of an event of default under this Agreement. The failure of either party to this Agreement to insist at any time upon the strict observance or performance of any of the provisions of this Agreement, or to exercise any right or remedy as provided in this Agreement, shall not impair any such right or remedy or be construed as a waiver or relinquishment of such right or remedy with respect to subsequent defaults. Every right and remedy given by this Agreement to the parties to it may be exercised from time to time and as often as may be deemed expedient by those parties.

Section 27.  **Applicable Law and Partial Invalidity.**  The execution, interpretation, and performance of this Agreement shall in all respects be controlled and governed by the laws of the State of Illinois. If any

part of this Agreement shall be declared invalid or unenforceable, Agent shall have the option to terminate this Agreement by notice to Owner.

Section 28.　　Notices.  Any notices, demands, consents, and reports necessary or provided for under this Agreement shall be in writing and shall be addressed as follows, or at such other address as Owner and Agent individually may specify hereafter in writing:

| Agent: | On Behalf of Owner/Entities: |
|---|---|
| Paper Street Properties<br>2440 W Madison St, Suite C<br>Chicago, Illinois 60612 | _____<br>2440 W Madison St, Suite C<br>Chicago, Illinois 60612 |

Such notice or other communication may be emailed to ownerops@paperstreetrealty.com or mailed by United States registered or certified mail, return receipt requested, postage prepaid, and may be deposited in a United States Post Office or a depository for the receipt of mail regularly maintained by the post office. Such notices, demands, consents, and reports may also be delivered by hand or by any other receipted method or means permitted by law. For purposes of this Agreement, notices shall be deemed to have been "given" or "delivered" upon personal delivery thereof or ==forty-eight (48)== hours after having been deposited in the United States mail as provided herein.

Section 29.　　Agreement Binding upon Successors and Assigns.  This Agreement shall be binding upon the parties hereto and their respective personal representatives, heirs, administrators, executors, successors and assigns.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first above written.

| Agent: | Owner: |
|---|---|
| Paper Street Realty, LLC | Bruce J Spagnola Jr |
| By: _____ | By: _____ |
| Managing Broker | Its: Managing Member |
| | 01/01/2021 |

PAGE LEFT INTENTIONALLY BLANK

**Fee Schedule – Addendum to Management Agreement**

Management fee – A management fee equal to $60 per unit per month shall apply.

Maintenance Technicians - $35/hr per technician (2-hour minimum charge)

Property Managers / Non-Labor Field Personnel / Field Admin and Access - $35/hr (1 hour minimum).

Evictions – Eviction actions are handled by an attorney retained by Paper Street. Attorney invoices for representation and filing fees shall incur a 20% upcharge to the client. Property Manager or Field Personnel time is charged for delivery of notices (1st delivery attempt by a Property Manager is included in management fee unless SPS is used), court appearances requested by owner, etc. See rates herein. The charge for waiting on the sheriff to execute an eviction is $35/hr with a 3-hour minimum. This is because a 3-hour window must be blocked out of an employee's schedule to ensure they are on site when the Sheriff arrives.

Collections – Rent collection via mail, online payment, and phone payment are included. Tenants are charged a flat fee for credit card and EFT payments. That fee is retained by Paper Street. Collection calls, creation of delinquency notices and payment plans are included. Collection visits to the property (if tenant cannot be reached or doesn't respond to phone calls) and delivery of 5-day notices by Special Process Server are charged at $40 flat. For tenant rent pickups, the tenant is charged $10 (retained by Paper Street). If the owner requests that Paper Street not charge the tenant for a rent pickup (and if the tenant absolutely cannot or refuses to make payment by phone, currency exchange or mail), there is a $40 flat charge to the owner. If the amount of rent being picked up is less than $500, then the charge for pickup is 5% of the amount collected.

Tenant Charged Fees – Late fees, application fees, non-sufficient funds (NSF) fees and lease admin fees are fees that Paper Street charges to tenants. These fees are retained by Paper Street Properties and are not credited to the owner.

Notary – There is a $20 fee per document that needs to be stamped by the notary. If using our partner eviction attorney or if client's attorney can notarize remotely, there is no charge for this service on 5 Day, 10 Day or 30-Day Notices.

Subsidy Inspection Maintenance – Time and materials are billed to the client. See above for Maintenance Technician hourly rates and Property Manager / Field Personnel rates. Each failed item on a subsidy inspection list is considered a separate and unique repair under this agreement and Is not subject to the maintenance limits set forth in section forth is section 10.1 and 11.

Leasing - Paper Street charges the Owner a commission equal to one month's rent for leasing any dwelling unit located on the Premises. One month's rent is equal to the amount stated on the lease as the monthly rent amount. This is charged in addition to any fees associated with marketing the listing. Marketing fees shall not exceed $100 for any single listing and are not charged until the unit is leased. Alterations to this fee structure can be made on a per unit basis so long as it is agreed upon in writing by the Owner and Paper Street. The Owner may, from time to time offer special leasing incentives or cap a leasing commission on specific properties. Lease preparation, RTA Packet completion and tenant screening are services included under your basic management fee. Tenant applicants are charged an application fee. That fee is retained by Paper Street. Owner is charged a flat fee of $150 for each **Lease Renewal.**

3rd Party Maintenance and Repairs – Most repairs are done in house. If a 3rd party vendor is chosen to perform a job, we negotiate the best possible price for the work. A 20% up-charge is added to all 3rd party maintenance and repair estimates.

Project Management – Paper Street may charge 10% of the total project cost to oversee outside or owner contracted construction projects exceeding $10,000. This does not apply if RRA is the General Contractor.

Lawn Services – Lawn service shall be placed on a weekly basis (during the normal lawn maintenance season) for each property at market rates.

Snow Removal – Snow removal and salt spreading service shall be placed on a per occurrence basis at market rate.

Janitorial - Regular janitorial service shall be placed at the property to occur at an acceptable interval. Costs to be determined based on property needs.

Extermination – Extermination services shall be placed on a regular schedule at market rates. Special services such as bed bug treatment or rodent eradication shall be ordered on an as-needed basis.

Unit Turns and Rehabs – Unit turns typically encompass multiple repairs and capital expenditures and therefore are not subject to the single item maintenance limits set forth in section 10.1 and 11. However, Paper Street's affiliated company, Rent Ready Apartments, may submit labor and material bids for unit turns, construction and rehab that is expected to greatly exceed the individual maintenance and capex spending limits set forth in this agreement. To prevent conflicts of interest, the owner is encouraged to solicit other bids for comparison on their own or may choose to accept the bid submitted by RRA.

Equipment Rentals, purchases, materials etc. are billed at cost and passed through to the client. Our bulk discounts are also passed on to the client. There is a $50 flat charge for picking up and delivering materials to the specific job site. Material pickups are planned so that it minimizes cost to the client and improves efficiency.

Many pass-through charges are billed at cost to the client. This includes governmental fees, fines, CHA re-inspection fees, citations, licensing fees, etc. Paper Street will make these payments on behalf of the property owner and pass the cost along to the property owner without markup.

Property Preservation Fee – Paper Street charges the greater of $50 per door or $500 per month as a property preservation fee for any property that is kept under 50% occupancy by the owner for the purposes of sale or construction. This charge does not apply for normally occurring vacancy while units are being rehabbed and the property is being actively marketed for rent.

Final Turnover Fee: $500 is charged upon an early termination of this agreement to cover the cost of final accounting and turning over the property files to the owner or another management firm.

Onboarding Fee: $250 per property is charged as an onboarding fee. This includes gathering and entering all data provided by the owner or outgoing management company.

SPECIAL PROJECT administrative fees – $50hr (no minimum) Fees are assessed on special projects only.

Special projects may include:
Document Preparation and Assistance for Purchase and Refinance Loans
Document Preparation and Assistance for Building or Portfolio Sales
Document Preparation and Assistance for IRS or Court Audits
Document Preparation and Assistance for Legal Matters (other than eviction cases)
*Rent Rolls, Financial Statements, Leases and more are available for access at any time at no additional cost via the online Owner Portal.

After Hours Charges – For after-hours emergencies, maintenance technicians are billed at $70/hr (2 hour minimum). Property Managers are billed at $70/hr (1 hour minimum). After hours include M-F after 5pm and before 7am. Saturday & Sundays are also considered "after hours". Paper Street stringently evaluates the need for "after hours" maintenance or management. If the situation can be handled during normal hours, and does not present the threat of creating further cost, damage or liability to the owner, it is our policy to address the matter during the next regular business day in order to limit the charges to the owner. Some of our employees may log time on the weekends or after 5pm that is not related to emergency matters. Since this is at the discretion of the employee, after hours charges shall not be incurred to the owner in these instances.

**Electronic Funds Transfer Authorization**

I/We _____ (RENTAL OWNER) hereby authorize Paper Street Realty, LLC dba Paper Street Properties (THE COMPANY) to initiate entries to RENTAL OWNER'S bank account at the financial institution listed below (THE FINANCIAL INSTITUTION). RENTAL OWNER has attached a void check for the bank account specified below and hereby swears and affirms that RENTAL OWNER is authorized to make such agreements and is an authorized signer of the bank account specified below. This authorization is to remain in force until THE COMPANY has received written authorization from RENTAL OWNER of its termination or change; in such time as to afford THE COMPANY and THE FINANCIAL INSTITUTION a reasonable opportunity to act on it.

RENTAL OWNER grants THE COMPANY the right to correct any Electronic Funds Transfer resulting from an erroneous overpayment by debiting RENTAL OWNER'S account to the extent of such overpayment.

Name on account:_____

Address: _____

Telephone: (_____) _____    Email: _____

Signer 1 Name (Printed):_____

Signature: _____    Date: _____

Signer 2 Name (Printed):_____

Signature: _____    Date: _____

**Account Information**

Financial Institution Name:_____

Street Address: _____

City, State and Zip Code: _____

Telephone: (_____) _____

Checking Account Number:_____

Financial Institution Routing Number _____

FORM WILL NOT BE ACCEPTED WITHOUT A VOID CHECK ATTACHED